So this case is about old growth habitat in the Lewis and Clark National Forest and how the Farm Bill affects protection of that habitat. There's two issues that I would like to address to the panel today. The consistency of the Moose Creek Project with the Lewis and Clark National Forest Plan's old growth provisions, which is a Forest Act issue, and the issue of cumulative effects under the Farm Bill's scoping requirement, which requires us to address the categorical exclusion issue under the Farm Bill. So beginning with the Forest Act issue, this is relatively straightforward. The starting point for old growth analysis in this case is that the Moose Creek Project area does not have enough old growth habitat to meet the Forest Plan's minimum standards for ensuring the viability of old growth species. And yet under the authority of the Farm Bill, the supervisor approved further depletion of old growth forest as part of this project based on a determination that eliminating stands under 10 acres in size of old growth is of no significance to old growth species viability. I have a fundamental question. Do the planters have standing in this case? Yes, we do have standing. Tell me how. The plaintiff is basically concerned over the old growth species viability in the Lewis and Clark National Forest. But you have an organizational plaintiff, right? I'm sorry? You have an organizational plaintiff? Yes. So you have to show some concrete injury to members? We have to show an interest in something that's affected by the project, a species of animal or plant. And in this case, their concern is over old growth species. But you have to show that at least one of your members is impacted, and you did that with the declaration from Dr. Sarah Johnson, correct? Yes. Was her declaration adequate to establish standing? Because she had never been to the mountain, right? Yes, she had been to the mountains, but not to the specific project area. She testified that she's actually done quite a bit. She has a longstanding concern with the Little Belt Mountain Ranch. Yeah. And the important point is that she's never been to the project site, but she has concrete plans to visit the project area. Is that sufficient under the Supreme Court's precedent to establish standing? It is. What's the strongest case you have for the proposition that a person who's never actually visited the location of the project but intends to do so has established standing? Ecological Rights Foundation versus Pacific Lumber Company. Okay, that's your strongest case? That's 9th Circuit 2000. Okay. So basically, so that was applying laid law, the Supreme Court decision. Under laid law, it is enough for the plaintiff to establish a connection to a particular area that would be affected by the decision. And here, and as he established frequent contacts with the Little Belt Mountain Ranch and the Lewis and Clark National Forge, together with aesthetic and recreational interests in viewing goshawks, moose, deer, pine marten. Okay. Okay, so the important point here, though, Your Honor, is that species viability is not determined at a project-specific level. It's a forest-wide concern. So if they're eliminating old-growth habitat in a way that affects the species viability forest-wide, then it's enough to have a connection with that species and the forest, the forest itself, without having to visit the project area. And we've cited case law to that effect. Nonetheless, though, she did say she had intentions to visit the area. She has visited, I think, and will visit again. Because I'm not sure she would have standing, or you would have standing, the organization would have standing, if she didn't at least have that. She's the executive director. Well, I mean, you can't just say, well, you know, I'm concerned about the overall forest, and, you know, if you – if you adversely affect the overall forest, it's going to – it's going to impact my enjoyment of the forest. I mean, I think she has to say she intends to visit and will visit and has visited the forest. She may not have visited this particular plan, this particular project, but … She has – yeah, her declaration … Right. I understand that, but it's … Okay. So then – so the basic issue with old growth is the application of the old growth standard from the forest plan and the interpretation that it's okay … Now, this – there has been no amendment to this particular forest plan. No. The question is, are they complying with the … With the existing forest plan. Yes. And so the standard says you have to have at least 5% old growth habitat, and they admit we don't have 5%. Right. And so – and then the Farm Bill says, of course, maximize – you know, maximize the amount of old growth habitat. So they're interpreting the forest plan standard to say that it's not old growth habitat if it's in a stand that's less than 10 acres, even though, in this case, those 10-acre stands are in contiguous forests. It's not like they're isolated little islands. They're in a forest, and they're – in the forest, there's 10 acres or less. They're saying, well, yeah, it meets all the criteria for old growth habitat, but we don't have to protect it, and we can actually clear-cut it. And we're – how is that true? And they say because there's a recommendation. The old growth definition doesn't say that. The criteria from the regional forester that are incorporated into the forest plan has whole tables of minimum criteria. None of them have minimum criteria for stand size. But there's a recommendation in the silvicultural standard that, when you're setting aside old growth habitat to meet the 5% minimum, you should favor stands that are larger than 20 acres in size. So, in other words, don't go after the best old growth habitat and save, you know, old growth habitat that might not be as valuable. So that's fine. That's an ecological standard that makes a lot of sense. They've taken that standard, which is an ecological shield, and they've turned it into a silvicultural sward and said, that means we don't have to protect it at all, even in an area of the forest that doesn't have enough habitat to ensure the viability of old growth species. And we believe that's just not only arbitrary and capricious, it has no basis in science. Well, isn't there a battle of the experts here? No. No? No, there's not. The forest plan says what the forest plan says. We're not – we're basically arguing in favor of the forest plan. They're making an administrative decision that because they should favor larger stands of old growth, they're saying that means we don't have to protect smaller stands of old growth. And we're saying that just doesn't make any sense. It doesn't make any sense linguistically, logically, rationally, scientifically, legally. There's no science to support. Okay, it would be a battle of the experts, Your Honor, if they could point to science that says, you know, a 10-acre stand of old growth habitat is of no use to wildlife. And you say they don't have any experts? No such science out there. And their experts aren't saying, you know, that species won't use this habitat. Where did the 10-acre standard come from? Just arbitrarily plucked out of the air? Well, they're saying anything under 20 acres. 20 acres. Yeah, it's a recommendation. So you won't find it in the definition of old growth. You won't find it in the regional criteria for minimum criteria for old growth. There's a silvicultural standard which says when you set aside the 5% habitat for old growth species, it's better that you set aside stands that are larger than 20 acres than stands that are smaller than 20 acres. The assumption, obviously, is that you have more than 5% there. We don't have more than 5% here. And they're saying that doesn't matter. Now we can eliminate all the 12. In other words, Your Honor, you could have an area of the forest that had 5%, but if all of the 5% in the habitat was under 20 acres in size, composed of stands that were all under 20 acres in size, then under the Forest Service interpretation, they could clear cut all of that old growth. That would be totally consistent with their interpretation of this recommendation. But the bottom line is that's a recommendation. It's not a standard. I mean, it's a recommendation as part of the silvicultural standard, but it's a recommendation that's intended to protect species and to protect habitat, and they're using it as a justification for eliminating habitat. That's our case. I wish it were that simple. Okay. I'll save the rest of my time for rebuttal. Thank you. So are you devastated by opposing counsel's argument at this point? I'm confused by it. And I'll explain why. Make your appearance. First, yes, may it please the Court, my name is Michael Gray. For the Forest Service, with me at counsel table is Lawson Flight. I'm going to try to save him six minutes of the time to speak. And the reason I'm confused by the old growth argument here is that he says it's a Forest Act claim and that the problem is a failure to comply with the forest plan standard, but the opening brief doesn't cite the Forest Act, and the issue is briefed as one of the Healthy Forests Restoration Act and the categorical exclusion. So I'm a little bit bewildered as to why. Today it's a forest plan compliance problem, whereas up until today it's been a question of whether we've maximized the retention of old growth as appropriate, consistent with management for disease and control, in order to use the categorical exclusion under the Healthy Forests Restoration Act. And so I hate to introduce more confusion here because I know that the intersection of NEPA, the Forest Act, the Healthy Forests Restoration Act can be confusing, but this case was briefed as a Healthy Forests Restoration Act case and not a National Forest Management Act case. As to the 5% standard, anyway, if you want me to address it, what the forest has said is that it's not affecting that standard at all because the 20-acre recommendation that he talks about, they don't count anything less than 20 acres towards the 5% in the first place, and they're not cutting anything more than 20 acres, so they're not affecting the compliance with the standard at all in any event. And under the issue is actually briefed, the Healthy Forests Restoration Act, there is a scientific... I mean, it's the same thing as the previous case. We had a scientist who went out, walked the area. There's thousands of pages of surveys of old growth. There's an old growth report in the record that catalogs where the old growth is. They redesigned elements of the project to avoid old growth, removed and dropped units entirely where there was old growth, and retained everything. They went beyond what the forest plan standard requires here. The recommendation is 20 acre for old growth management. They went beyond that and retained everything that they found that was greater than 10 acres in this project area, and there's only a few small stands that have some old growth characteristics that they found were isolated and not functional as old growth habitat that are included in a couple of units. And so the idea that they didn't maximize... I mean, the standard is maximize the retention of old growth as appropriate to address and to the extent necessary to address disease and insect, and they did that here, and it is. It's a scientific determination by the Forest Service. That's entitled to great deference from this court on a longstanding precedent like Baltimore Gas and Electric from the Supreme Court. I do want to address standing briefly here because we don't take lightly and raise standing arguments lightly. We didn't raise a standing argument in the previous case where the declarations are better, but there really is a problem here with these declarations. They just don't rise to the level that the Supreme Court and this court have required to establish standing. And it's not just that you've never visited the project area, but when you have never visited a project area and you don't have the preexisting relationship, then you do need specific facts to survive summary judgment of plans to actually go there that existed when you filed the complaint. You can't establish standing by saying, Well, I like this forest generally, and now there's a project over there where I've never been, and file a complaint that at that point there were no allegations that she was going to visit. Only later at summary judgment did she file declarations that say, Yeah, I want to go there. And one of those said, I've learned a lot about this through this process, and now I want to go. That's not the way you establish standing. You have to have an interest, an injury, an imminent injury at the time the complaint is filed. And these declarations simply don't rise to that level. And I think... Counsel, what case are you relying upon to support the proposition that the plans have to be solidified at the time the case is filed? Well, this court, well, the Supreme Court has said in the Lujan cases that, and in other cases, just jurisdiction generally, is at the commencement of the lawsuit. This court, in the Biodiversity v. Badgley case, said that standings determine as of the commencement of the lawsuit. But that's a very precise argument regarding the date within which the intent must be formulated. So do you have a case that says specifically if someone intends to visit the site, that those intentions have to have been effectuated prior to, been manifested prior to the date of the filing of the case? That's a really important point. I'm not aware of a case that makes precisely that point. It's the intersection of two lines of cases. The first, which I just discussed, which is that you have standings determined as of the commencement of the lawsuit, as is all jurisdiction for federal courts. The second is that you have to have, to establish your standing, concrete plans and a firm intention to go there. And that can be established, I think, in some instances where you, like the case you relied on, the Ecological Foundation case, which was a case where there was a longstanding recreational interest in a body of water that was going to be impacted. There was a Clean Water Act claim. And then we have a longstanding recreational interest. We go there a lot. We plan to go there more. That's this. But when you don't have that longstanding interest in a site, then you need to establish at the time you file your lawsuit, because that's when the injury is determined, that in fact you're going to go there and you will suffer the injury from it. And it's not good enough to say, well, we used the forest generally, because the Supreme Court rejected those sorts of arguments in both Lujan cases, where the first one, the Lujan National Wildlife Federation said, in the vicinity of a project is not good enough. Why isn't it good enough to say I have imminent plans to visit? Why isn't that good enough? Well, it might be, but the plans need to exist. You can't develop the plans after you file the lawsuit. That's not the way standing is supposed to work. Well, she had said that she had visited the forest before. But not this particular area. Correct. The Supreme Court has made clear it has to be the area that they rejected. So why isn't it enough for her to clarify at summary judgment what her plans are, or whatever happened to this case came up to us? It came up on summary judgment. Well, she didn't make the – there were no allegations in the complaint. And there were no – in the previous case, she filed declarations along with the complaint that said, I've been to this area before. I plan to go there again. There were no – there was no affidavit filed here with the complaint. They were seeking an injunction in the prior case, though, weren't they? Didn't they seek an injunction in the prior case? Yeah. They sought an injunctive relief in this case. In the prior case. In the prior case. Did they seek an injunction in this case? They sought a – yes. They sought an injunction pending appeal in this case as well. Well, that's after – that was after the district court's judgment. But, I mean, in the district court, in this case, did they seek an injunction? I believe that they did seek an injunction. I mean, certainly they were seeking injunctive relief. Is that the first time that she submitted her declaration? No. The declarations came in on summary judgment proceedings. Okay. So then at the preliminary injunction stage, you said – Well, I'm not sure – I don't want to misspeak. I'm not certain. I don't recall there being an injunction in this case. There was in the prior case. I don't want to misspeak. I'm not certain whether she moved for a preliminary injunction. They certainly sought injunctive relief. But her declarations or affidavits were filed – At summary judgment. About her – where she addresses her interest in the forest and in plans to visit this particular area, they're submitted in connection with the summary judgment. Yes. They were submitted in connection with summary judgment. At summary judgment, you have to plead specific facts. I mean, the other problem here – So your complaint is that, well, when she submitted that declaration, she didn't say that before this lawsuit was filed. Right. Right. This is – I had visited the forest. I had visited. I've been back there several times. I plan to go back to the forest. And I plan to go and sort of take in the project. Right. This is an area where I wanted to go, and now this project is going to affect me. And her declaration should have said that. It was all in place before she filed the lawsuit. I think that's the natural consequence of saying that – But you can't point to any case that says that. Well, I can point to, as I said, the cases that establish that standing is determined as of the commencement of the lawsuit. I don't know how you can't establish your standing based on facts that occur later. But I don't want to get too bogged down in it because I think we have such a good case on the merits that it doesn't particularly matter. But we do take the Supreme Court's standing jurisprudence seriously. And the other problem is the allegations are conclusory. She says, I have a concrete plan and firm intention to go, but there's no – that you can't just encamp the standard and then end up with standing. You need actually specific facts to get past summary judgment, and those aren't here. But as I said, I don't think it's going to affect the outcome in this case because I do think that our Healthy Forest Restoration Act case is good. And, you know, Mr. Wibery did not address the extraordinary circumstances issue, so I'm happy to submit that on the briefs unless the Court has questions about that with the categorical exclusion. Thank you. I'll let Mr. Fite speak. Good morning, Your Honors. Lawson Fite here on behalf of Marr County, Montana, as well as Montana Logging and Wood Products Associations. Marr County's interest in this comes from its interest in forest health in the surrounding area. There's a lot of overlap between this project and the county's community wildfire protection plan. The industry associations share that. They obviously have an economic interest, but they also have an interest in a healthy, productive forest, one that can provide for the multiple uses that national forests are established for. I thought I would address standing first and not spend ñ well, I'd just make one point. I see you shaking your head, Judge Paez, but just one point there. The Little Belt Mountains, 1.5 million acres. The planning area for this project, 20,000 acres. Treatment for this project, 2,000 acres. So the Little Belt Mountains, having an interest in that is not sufficient. Got it. Big pardon? Got it. On the old growth claim, counsel spoke in his opening presentation about the consistency of the project with the forest plan old growth standard. That claim was not raised in this case. It was not part of the complaint. The plaintiff moved to amend the complaint, and that was denied on May 22, 2018, docket entry 21 in the district court. So that is not a live claim before this court. Where old growth comes in in the HFRA claim, Healthy Forest Restoration Act, is that there is the requirement to retain, maximize the retention of old growth to extent appropriate. And the district court held that the Forest Service was complying with its forest plan standard, and that seemed adequate. I would add that if you look at pages 121 and 22 of the excerpts of record, there is a summary of the surveys for old growth, and they surveyed every unit to be treated for old growth and said, we may not know where all the old growth is in the planning area, but we know where it isn't. It isn't in the treatment units. And that leads to a conclusion that old growth is not being affected by the project. The project overall will enhance the ability of the forest to develop late successional stands. It will enhance the ability of the forest to provide habitat, and it will affect the beetle and mistletoe epidemics as well as reduce fire risk. On NEPA, so this is a categorical exclusion, a way to comply with NEPA in an expedited manner. This is exactly the type of project envisioned by the Farm Bill, the 2014 Farm Bill. The Farm Bill itself has a specific list of requirements for a project, and it's a statutory categorical exclusion. It is not a regulatory one, and so the statute displaces any regulatory procedures such as the extraordinary circumstances procedure. What's the language of the statute? The language of the statute, it is in section 6591, and it goes through 6591B, sub B, and goes through all the requirements for a project. It says above, a project described in subsection B may be considered categorically excluded. But maybe, so what does maybe mean? It puts it to the discretion of the Forest Service to determine whether this is the best tool to use at this time. It provides also those. So there's not a statutory automatic categorical exception? Right. It defers to the Forest Service's expertise and the Secretary in developing and applying these projects. Now, if there were a requirement to apply the extraordinary circumstances regulation, it would be hard to read that in from silence when in this same section of Title 16, or same chapter of Title 16, section 6554, and then 6591D and 6591E all explicitly say extraordinary circumstances, and this is silent on that. And it's this section was enacted after 6554, but before 6591D and 6591E. Let me ask you this. For this particular project, didn't the agency do an extraordinary circumstances analysis? They did in an abundance of caution, and they determined there were no such circumstances. So you're saying it wasn't necessary for it to do that? Correct. That's right, Your Honor. Didn't seem to be a big problem for them to do it, though. Not in this instance. Basically, if you look at the way the Farm Bill is structured, it's about expediting these projects because there's a recognized need. You have, in this instance, in the state of Montana, Governor Bullock designated about 5 million acres as needing treatment. And I will say on the landscape designation, since it's a governor's request, that's non-discretionary with the Forest Service, and that's why NEPA doesn't apply to the landscape. We have a case, a recent case. Yes, yes, the Sunny South Project. That one's a little different because that was a chief-designated landscape under – if you go back to 6591A, sub-B, sub-1 is where we are, and that was sub-2. That was a discretionary designation by the chief. But in general, the overriding purpose to expedite treatment across the landscape of this statute means that the courts should be reluctant to read in procedures unless it's absolutely necessary or unless it's explicit. And so whether or not it was a hassle or trouble for the Forest Service to go through extraordinary circumstances in this case, it's not provided for by the statute, and the courts should be reluctant to read it in there. Anything else? That's all I have. Thank you, Your Honors. We urge you to affirm the district court in this case. Okay, thank you. So I want to start where Lawson just left off. These are all wonderful post-hoc rationalizations of why extraordinary circumstance analysis does not apply. But the Forest Service itself, in interpreting the Farm Bill categorical exclusion, was very clear to the public that these categorical exclusions didn't – or the Farm Bill did not change any of the applicable laws, including NEPA, and that was the purpose for submitting the supplemental citations earlier this week, basically that what the court should defer to is what the agency still says on their website, which is that, yes, this categorical exclusion – They did do an extraordinary circumstances analysis here, so to some extent the argument whether it's categorically exempt is somewhat academic because they did it here. Right. And the question then is whether or not what they did, is it arbitrary and capricious? And that's a pretty hard argument for you to make. No, it's actually a very easy argument to make. Oh, it is? Yeah, because the reason that we actually know extraordinary circumstance analysis is required under the Farm Bill is because Congress said, you shall do scoping. And Congress didn't define scoping separately from what the regulations – how the regulations define scoping. And the regulations are very clear that in scoping a project to exercise that discretion of whether or not to categorically exclude it or not, you have to do cumulative effects analysis. And in the record of this case, there's no – they never considered cumulative effects analysis, even though this is an area that has been heavily logged, heavily clear-cut, and is no longer meeting the minimum standards. That does sound like a NEPA argument. It is a NEPA argument. Well, how does that relate to the extraordinary circumstances determination? As part of the extraordinary circumstance analysis, the Forest Service is supposed to consider the cumulative effects, whether or not there are significant cumulative effects because of past historical logging or similar projects nearby. And so they didn't do that analysis here. But they're saying there's no old growth in these smaller patches on the treatment project. Isn't that their argument? The cumulative effects argument has to do with both old growth and excessive clear-cutting. There's been over – including this project now – okay, in the past, there's been over eight square miles of clear-cuts in the project area. And the project includes another two square miles of clear-cutting. So ten square miles of clear-cuts in an area of the forest that no longer provides for the needs of wildlife species. So from our standpoint, that's an obvious cumulative effects significant that requires a significance determination on the cumulative effects of approving this project. And the Forest Service did not engage in that analysis. So it's inconsistent with their own regulations and policies and guidance in doing scoping, which – and so that's our basic argument. There's no cumulative effects analysis. Thank you. And then returning to the old growth, in order to defer to the Forest Service interpretation of their plan on old growth stand size, the court would have to find some ambiguity in the forest plan. So counsel says, we're not entering – we're not logging any old growth in this project. Okay, well, old growth is defined in the forest plan as, quote, a stand of trees that has passed full maturity and showing decadence, the last stage in forest succession. So are they logging stands of trees that are past full maturity and showing decadence? Yes. They're saying, but this only applies to stands that are more than 20 acres in size. Where's the ambiguity? Does it say that? No. So following that definition of old growth, there is an ecological definition of old growth forest, which begins by the standard definition of old growth is not available due to great variations in site productivity, species composition, stand history, and other variables. And then it proceeds to set forth an ecological definition for application in the Lewis and Clark National Forest, which, once again, says absolutely nothing about minimum stand size. And then even more detailed criteria are incorporated into the forest plan after it was adopted from the Regional Guide on Old Growth Forest Types. And green includes … Let me just ask. The Governments Council said that your argument here based on, with reference to the forest plan, was really not the way the case was teed up. That's not. Is that correct? We wouldn't be here if that was true. Yeah, this is basically what our … He thought this was basically a healthy forest restoration act. Definitely. I mean, I don't have the complaint with me, but … Well, you're responsible for the complaint, right? Sorry? I said you were responsible for the complaint, right? Yes, yes. So … Yeah, and we did raise Forest Act claims and NEPA claims and challenged the rule. No, but the point is, what did you raise on appeal with us? I mean, I thought this was all about the standards that were set by the Healthy Forest Restoration Act. The Healthy Forest Restoration Act requires that every project be consistent with the forest plan. So that gets us to the forest plan. Right. And so our arguments have consistently been they're not complying with the forest plan because they're violating the old growth standard. So when Council said that in the district court you sought to amend the complaint to bring a specific claim under the failure to comply with the Forest Act standards and it was denied, what's he talking about? The judge didn't allow us to raise issues regarding moose in Moose Creek, Timbersdale. We amended the complaint to add greater specificity of the Forest Act claims, one of which had to do with moose, and we basically couldn't argue about moose. So we were limited to arguing about goshawks and three-toed woodpeckers. Okay. Yeah. So, yeah, those are the arguments. Basically they're not complying with the forest plan and there's cumulative effects that have never been considered. Thank you, Your Honor. Thank you, Counsel. We appreciate your arguments in this case. We're going to submit it at this time. And that ends our session for today and for the week. Thank you all very much. And then we will, after we conference, we'll be back out to talk with the students. Thank you.
judges: Gilman, Paez, Rawlinson